IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
January 23, 2019 Session

## STATE OF TENNESSEE v. MICHAEL GREEN

**Appeal from the Criminal Court for Knox County**
**No. 105761A    Steven W. Sword, Judge**

_____

### No. E2018-00350-CCA-R3-CD

_____

The Defendant, Michael Green was convicted by a Knox County Criminal Court jury of two counts of aggravated kidnapping, a Class B felony, and two counts of attempted aggravated kidnapping, a Class C felony.  T.C.A. §§ 39-12-101(a)(1)-(3) (2018) (criminal attempt); 39-13-304(a) (2018) (aggravated kidnapping).  The trial court merged the convictions into a single aggravated kidnapping judgment and sentenced the Defendant, a Range II offender, to fifteen years to be served at 100%.  On appeal, the Defendant contends that (1) the evidence is insufficient to support a conviction of aggravated kidnapping or attempted aggravated kidnapping, (2) the trial court erred in denying his motion to dismiss the case due to the lack of a preliminary hearing or for a delayed preliminary hearing, (3) the court erred in denying his motion to suppress his pretrial statement, and (4) the court erred in denying his request for a jury instruction pursuant to *State v. White*, 362 S.W.3d 559, 578 (Tenn. 2012).  Upon review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and D. KELLY THOMAS, JR., JJ., joined.

Gerald L. Gulley, Jr. (at motion for new trial and on appeal), and Robert L. Jolley, Jr. (at trial), and Megan Swain (at trial), Knoxville, Tennessee, for the Appellant, Michael Green.

Herbert H. Slatery III, Attorney General and Reporter; Jeffrey D. Zentner, Assistant Attorney General; Charme Allen, District Attorney General; Ta Kisha M. Fitzgerald, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

The Defendant's convictions relate to a June 5, 2015 incident involving a female college student in a Knoxville shopping center parking lot.

At the trial, Knox County Emergency Communications District employee Michael Mays testified that he compiled the records related to the present case. A recording of a 9-1-1 call was played for the jury. In it, a female caller stated that she had just seen two men try to push a woman into the back of a "van" in a parking lot. She said the men were "jumping on the interstate" traveling east. She said the victim had screamed, "Let me go. Let me go." She described the vehicle as an old, rusted, brown "Jeep" or "Bronco." She said that the men "shoved [the victim] in the car," that someone at a Mexican restaurant told the men to release the victim, and that the caller followed them but was unable to obtain a license plate number.

The twenty-two-year-old victim testified that she had been a college student on the date of the incident and had been working two summer jobs. She said that on the date of the incident, she had gone shopping for dog treats and clothing around 10:00 p.m. She said she went into the store with her wallet, cell phone, identification, and keys. She said her wallet was in her hand. She said she parked a distance from the store because she liked to walk.

The victim testified that she left the store and unlocked her car with a remote control. She said she noticed a light-colored SUV parked next to her. She said the vehicles faced the same direction, with her driver's side against the SUV's passenger side. She said the SUV's engine was running and someone was sitting inside with the light on. She said the rear passenger side door of the SUV was open and blocked her driver's side door. She said that she saw legs in sweatpants behind the open door and that a man said something like, "Oh, am I in your way." She said she told the person to take his time. She said, "I'm somehow on the ground being choked from behind and all my things are scattered." She said she was on the ground between her car and the SUV. She said a man said, "Shut up, b----. I'll f--- you up." She said that she started screaming and that the man held his hand over her mouth. She said she was unable to reach her keys in order to activate her car alarm or to reach her cell phone. She said that the more she struggled, the more the man choked her. She said, "[H]e said he'll snap my neck if I don't shut up and get in the car." She said that the SUVs back seats were folded down and that the door was still open. She said she was scared and thought she might die or be taken away. She thought she lost consciousness from being choked and said her next memory was being bent over into the SUV with her legs out of the SUV. She said the man in sweatpants pushed against her, held her head down into the carpet, and said something like "grab her" to the other man. She said that she continued to scream and that the man had his hand on her neck and held her by her hair. She said she tried to push

-2-

herself out of the SUV. She said that someone approached and said something, that the man who had attacked her got into the SUV, and that the SUV drove away. The victim was left at the scene. She said she found her cell phone and sent a text message containing the SUV's license plate number to a friend. She said the license plate number was BGG2398. The victim agreed that the incident occurred "within a couple of minutes." She said that she returned to the store and that two store employees retrieved her wallet from the parking lot. She said she also recovered her keys and the shopping bag containing her purchases. She said nothing was missing from her personal items. She said store employees called 9-1-1.

The victim testified that her teeth cut the inside of her mouth from the pressure of the man's hand on her mouth. She said she had knots on her head, scratches, and bruises on her arms, legs, and ribs. She agreed that she was examined by paramedics but did not go to a hospital. She said the paramedics told her nothing could be done for her at a hospital. She said her neck was swollen for weeks. She said she participated in counseling. She said she withdrew from school during the fall semester of 2015 and cancelled her classes for the spring semester of 2016 because she was uneasy in crowds, in unfamiliar places, and around unfamiliar people.

The victim identified a photograph of an SUV with a Virginia license plate. The plate number was VGG2398. She identified a photograph of a bruise on her leg and said the photograph was taken a day or two after the incident. She said she remembered the perpetrator's eyes but could not make a positive identification. She initially said she had identified the driver but then said she was unsure whether she identified him. She thought the incident lasted at least two minutes. She was sure the person inside the SUV was in the driver's seat, not the passenger seat. She said the perpetrator got into the passenger side of the SUV before it drove away.

The victim acknowledged that she had been arrested for felony shoplifting on January 21, 2016. She said she had been on medication and had made a "stupid mistake." She agreed that she pleaded guilty to a misdemeanor and said she received diversion, which meant the offense would be removed from her record in a few months. When asked if she was cooperating with the State in order to be eligible for a U-Visa, she said that she had not spoken to anyone about her immigration status and that she had a permanent green card.

The victim testified that she tried to scratch the perpetrator with her fingernails. She agreed the police did not ask for her clothing until the day after the incident. She denied taking anything from the SUV but said something fell from it when she kicked it. She said she told the officers that night about something falling from the SUV but that they did not collect it. The victim drew a diagram of the scene, which was received as an exhibit.

Knoxville Police Department (KPD) Investigator Michael Washam testified that he assisted his partner, Investigator Clay Madison, in the investigation of this case. Investigator Washam said he and Evidence Technician Tim Schade went to Fort Worth, Texas, to obtain evidence from a 1997 Chevrolet Tahoe SUV that had been recovered. Investigator Washam said the police received information that the Defendant had been in the SUV and that "Mr. Keeney"[1] had been arrested in Texas. Investigator Washam said he provided information to Fort Worth Detective Patrick Henz for a search warrant affidavit relative to the SUV. Investigator Washam said he and Mr. Schade collected evidence from the SUV at the Fort Worth Police impound garage. He identified photographs of the SUV, which were received as exhibits.

Investigator Washam testified that he flew to Las Vegas, Nevada, on June 18, 2015. He said the police were notified on June 15 that the Defendant was in custody. Investigator Washam stated he provided Las Vegas Police with information for a search warrant affidavit relative to a car that was recovered in Las Vegas and for buccal swabs of the Defendant.

Investigator Washam testified that he and Las Vegas Police Detective Travis Ivey interviewed the Defendant at the Clark County, Nevada Jail. Investigator Washam identified the Defendant in the courtroom. Investigator Washam said he advised the Defendant of his *Miranda* rights before the interview. A written waiver of rights form and an audio recording of the interview were received as exhibits.

The recording of Investigator Washam and Detective Ivey's interview of the Defendant reflects the following: Investigator Washam read the Defendant's *Miranda* rights and asked the Defendant to sign a document. Investigator Washam told the Defendant that the authorities had video evidence of the Defendant and Mr. Keeney pulling out of a Knoxville shopping center and that a woman had said the Defendant tried to pull her into a vehicle but released her after a struggle. Investigator Washam told the Defendant that the authorities had evidence the Defendant had seen the victim and had waited for her to come out of a store before attacking her. The Defendant said he was confused as to what he was accused of doing. Investigator Washam advised the Defendant, "In Tennessee you are being charged with aggravated kidnapping." The Defendant denied that the incident occurred, and Investigator Washam responded that Mr. Keeney had said otherwise and that Mr. Keeney had said the Defendant intended to rob the victim but not to rape her.

---

[1] Other evidence showed that Bobby Keeney had been with the Defendant during part of the cross-country flight from Virginia and that Mr. Keeney had been present at the time of the offense involving the victim.

In the recording, the Defendant stated his understanding that newspaper articles suggested the incident was for "sexual purposes." Investigator Washam told the Defendant that Investigator Washam was talking to him to allow the Defendant the opportunity to confirm Mr. Keeney's statement that the Defendant's intent had been to rob the victim. Investigator Washam noted the Defendant's criminal history in Virginia. The Defendant expressed concern that he had been labeled years ago as "something that I'm not," that he was tired of living with the label, and that he wanted to live in peace. The Defendant said he was perceived to be a sexual predator based upon a sexual encounter he had with a sixteen-year-old girl when he was eighteen. He said he had served twenty-two years before he was paroled. He said that after he was paroled, he started a business and was doing well until he was charged with reckless driving. He said that he was told he would be incarcerated for a parole violation and that he fled Virginia before the incident in the present case. The Defendant acknowledged his other convictions for non-sexual offenses. The Defendant said that, under Virginia law, he was considered a violent sexual offender, had absconded, and would be confined for the rest of his life pursuant to Virginia's civil commitment law.

In the recording, Detective Ivey reiterated that the Defendant had an opportunity to give his version of the offenses. The Defendant continued to express his dismay that he had been labeled as a sexual offender. Investigator Washam told the Defendant that the Defendant was doing himself a disservice by not making a statement. Investigator Washam said that a Virginia attorney could argue that the incident in Knoxville had not been a sexual offense and that the Defendant was not "Ted Bundy"[2] and had not gone across the country raping and killing women.

In the recording, the Defendant said the incident did not happen. He said he found out two days before he left Virginia that his reckless driving charge was a Class 1 misdemeanor and would result in a parole violation. He thought he and Mr. Keeney left Virginia on June 3 in Mr. Keeney's gold SUV.

In the recording, Investigator Washam said that it made a "big difference" for a judge and a jury to know that a defendant had admitted the things for which the defendant was culpable. Investigator Washam asked the Defendant how it would hurt the Defendant to say the incident was not going to be a rape and abduction. The officers informed the Defendant that Mr. Keeney had said robbing the victim had been the Defendant's idea and asked the Defendant why Mr. Keeney would fabricate this. In reference to Mr. Keeney's account of the relevant events, Investigator Washam told the Defendant, "When you leave no other voices to be heard, that's the voice that's going to be heard." The Defendant continued to deny that the incident occurred. Investigator

---

[2] *See Bundy v. State*, 471 So.2d 9 (Fla. 1985); *Bundy v. State*, 455 So.2d 330 (Fla. 1984).

Washam said the victim and another person had provided the license plate number from the gold SUV to the authorities and that the authorities had evidence the Defendant and Mr. Keeney had been in Fort Worth, Texas, together. Investigator Washam encouraged the Defendant, "Tell it the way it was, not how it's being perceived," and stated the Defendant should say the incident was never going to involve rape if that was the case. Investigator Washam said Virginia had the Defendant "painted as the absolute devil" and asked the Defendant why the Defendant should allow this perception to stand. The Defendant protested that there was nothing he could do about it. Investigator Washam said the Defendant could not change the perception of the Defendant in Virginia but that the Defendant could have an effect on how he was perceived by the State of Tennessee.

In the recording, Investigator Washam advised the Defendant that the Defendant was charged with aggravated kidnapping and said that the charge did not have "a per se sexual connotation" but noted that it appeared from the Defendant's actions that he had grabbed the victim and tried to put her into the SUV.

In the recording, the Defendant agreed that he left Virginia with about $6000 and said he bought a car in Dallas, Texas, for $2000. He said he had spent a large amount of money on gas during his cross-country trip. He said he and Mr. Keeney had gone to Texas because Mr. Keeney wanted to visit the mother of Mr. Keeney's child. The Defendant said that he had been concerned about his legal status in Virginia and that Mr. Keeney thought they might be able to find a place in Texas to live their lives in peace. The Defendant agreed that he "bailed out" of Mr. Keeney's car when they encountered the authorities in Texas, said he was scratched from going through bushes and thickets afterward, and agreed that Mr. Keeney refused to allow the Defendant into their motel room when the Defendant returned to the motel. The Defendant said he did not sleep much because he was trying to avoid the authorities.

In the recording, Investigator Washam invited the Defendant to "set the record straight" and told him that in ten years he might regret not making a statement. Investigator Washam again asked the Defendant what he had to lose by making a statement, noted that the authorities knew the Defendant had been present, and said the only thing left to determine was the Defendant's intent. The Defendant continued to maintain that he was "screwed" no matter what he did. Investigator Washam told the Defendant that, despite the legal issues in Virginia, the Defendant had the opportunity to influence the outcome of his Tennessee legal issues. Investigator Washam asked the Defendant why the Defendant would give Virginia "any fuel to the fire" to paint him as "a Bundy" when the Defendant was not. Investigator Washam noted that the victim had said the Defendant tried to push her into a vehicle and said anyone who may have seen the incident from a distance would likely think the Defendant tried to push the victim into the vehicle, even it only appeared this way because the Defendant and the victim were struggling near an open SUV door. Investigator Washam said he had reason to believe

that the truth was something other than that the Defendant had tried to push the victim into the SUV but that the Defendant was the only person who could clarify his intent. Investigator Washam said the Defendant was adding to his Ted Bundy image by not clarifying his intent.

In the recording, Investigator Washam said that their conversation was being recorded and that what the Defendant said "was gonna [sic] get played" and would be "part of the public record of what occurred." The Defendant said, "I'm not that guy," and Investigator Washam invited the Defendant to explain what actually happened.

Fifty-nine minutes into the recording, the Defendant stated that he had never raped or attempted to rape anyone, nor had he ever wanted to rape anyone. Investigator Washam continued to tell the Defendant that the Defendant had the opportunity to help himself with his Tennessee legal issues by making a statement.

In the recording, Detective Ivey said the officers were going to collect a sample of the Defendant's DNA. Detective Ivey stated that if the Defendant had not touched the victim, his DNA should not be on her. Investigator Washam said that evidence had been collected from Mr. Keeney's SUV, including from the "carpet by that door" and seatback, and that it would be processed by the Tennessee Bureau of Investigation (TBI) laboratory. Investigator Washam said he thought the testing would detect the presence of the victim's DNA. Investigator Washam said DNA was "absolute" in court. He said that if the victim's DNA were detected, the Defendant was the only person who could provide evidence "that it was not what it looked like."

In the recording, Investigator Washam stated that the victim had been "scared to death" and had fought. He said the victim thought she was being forced into the SUV. The Defendant asked about the possible length of a sentence for aggravated kidnapping, and Investigator Washam responded that it was based upon a "points system" and that the Defendant had points based upon his Virginia convictions. Investigator Washam said that the range started at eight years and that he thought the maximum was twenty years. Investigator Washam said he had no control over a judge but that he had some influence with a prosecutor because he could tell the prosecutor whether the Defendant admitted or denied relevant facts. The Defendant expressed concern that evidence would be presented during a trial to show he was a registered sex offender, and the officers told him such evidence could not be admitted. Detective Ivey told the Defendant that in Nevada, prior convictions were inadmissible unless the prosecution sought a conviction as a repeat offender.

In the recording, Investigator Washam said he was asking the Defendant for the truth, rather than a specific story. The Defendant asked what Mr. Keeney was charged with, and Investigator Washam responded that Mr. Keeney was charged with aggravated

kidnapping. Investigator Washam said that based upon Mr. Keeney's statement and the Defendant's lack of a statement, it appeared that Mr. Keeney thought the plan was to rob the victim but that the Defendant had a different intent. Investigator Washam noted the evidence that the Defendant had been outside of the SUV but that Mr. Keeney had not.

In the recording, the Defendant asked what good would result from his making a statement, and Detective Ivey told the Defendant that the victim, not the Defendant, was the victim. Detective Ivey said the twenty-year-old victim had emotional trauma and thought she would be kidnapped, raped, and killed. The Defendant stated that he was not a rapist, and Detective Ivey challenged him to say what had happened. The Defendant expressed concern that whatever he said would be twisted. Investigator Washam said the victim was scared and was undergoing counseling. He said the Defendant was not being fair to the victim.

In the recording, the Defendant stated that he had always been a person to whom others could come for protection and that he was not being the man he had "prided" himself in being. Investigator Washam said, "Change that." The Defendant asked the officers to tell the victim he was sorry and did not want her to be afraid. He said that he and Mr. Keeney were spending money too quickly and that they decided on a whim to rob the victim because they thought they had an opportunity to get more money to fund their travels. The Defendant acknowledged that he saw the victim arrive and that they waited for her to come back to her car. He said he wanted to get jewelry and cash. He said they did not have any weapons or anything else to help "control the situation." He said that he got out of the driver's seat, that the victim came out of a store, that he had the door open to look as if he were doing something in the back of the SUV, that he said something like "excuse me" and tried to grab the victim's purse as she approached, and that she started screaming. He said he "freaked out" and "tried to shut her up." He said that whenever he released her, she screamed, and that when he held her, he debated whether to hold her or release her. He said he released her after Mr. Keeney stated that people were coming.

In the recording, the Defendant stated that he and the victim had been on the ground and that he had felt for her necklace but that she had screamed. He said that they somehow ended up leaning into the SUV and that from this point, he could not focus on whether she had jewelry because he was focused on trying to quiet the victim by putting his hand over her mouth and his arm around her throat. He agreed with Investigator Washam's assessment that his motive had been robbery and that the victim fought back "tooth and nail." When the Defendant said the police would not believe him, Detective Ivey stated that he believed the Defendant. The Defendant asked again for Investigator Washam to tell the victim that he was sorry and that she was not targeted for a sexual assault.

In the recording, Detective Ivey asked the Defendant what happened in Las Vegas and referred to a "chick who called in." The Defendant explained that he had met a homeless woman, who had agreed to rent a motel room and register a car in her name. The Defendant said this was "so we could help each other." He said the woman rented a hotel room in her name for three nights, that he bought food for her, and that he allowed her to drive the car. He said that he stayed in the room for two days. He said that after they had a disagreement about his giving her advice about the things that were being required of her in order to obtain custody of her children, she said she could not stay and left the room. He said the police arrived thereafter. He said he heard someone say that a newspaper clipping stated he had held a homeless woman against her will. Detective Ivey stated that the police had received a call reporting this information but said regarding the caller, "[N]otice she didn't stick around." Detective Ivey speculated that she had fabricated information in order to get a quick police response. The entire interview lasted about one hour and fifty minutes.

Investigator Washam testified that his intent in interviewing the Defendant was to obtain an admission that the Defendant had been present. Investigator Washam noted that Mr. Keeney had given a statement and that other witnesses identified the SUV as having been at the scene. Investigator Washam said that it did not matter for the purposes of an aggravated kidnapping charge whether the Defendant said the intent had been to commit robbery or rape. Investigator Washam said that the Defendant had already been charged with aggravated kidnapping at the time of the interview and that any admission of intent to commit robbery or rape would have been relevant to a consideration of whether an additional charge should be added.

Investigator Washam testified that he learned during the investigation that the SUV had been stopped by Texas authorities when the Defendant had been driving. Investigator Washam said the Defendant stated during the interview that the scratches on the Defendant's face were from the Defendant's running through bushes relative to this incident. Investigator Washam said a Las Vegas Police evidence technician searched a red Pontiac that had been attributed to the Defendant in Las Vegas.

Investigator Washam acknowledged that he told the Defendant during the interview that the Knoxville Police had a video recording of him and Mr. Keeney leaving the parking lot where the incident occurred. He said that Investigator Madison had viewed the recording and had obtained a copy of it. Investigator Washam said the copy Investigator Madison received was faulty. Investigator Washam said that he contacted the owner of the business from which the recording was made three times about obtaining another copy and that by the time he spoke with the owner, the original recording had been overwritten and no longer existed.

Investigator Washam acknowledged that no investigation was done of the victim's text message to a friend containing the SUV's license plate number. He agreed that no photographs of the victim's neck were taken on the date of the incident. He said the victim and another woman had provided the SUV's license plate number to the police.

Investigator Washam testified that he was aware that Investigator Madison had obtained a warrant for the Defendant's arrest on June 10, 2015. Investigator Washam said the police had received information from Virginia that identified the Defendant and Mr. Keeney. Investigator Washam said the Defendant was held in Las Vegas on a pending Tennessee warrant and on two Virginia warrants. Investigator Washam said the police received conflicting information about who had been in the SUV's passenger seat during the incident. He agreed that both the Defendant and Mr. Keeney had said the Defendant had been the driver.

Investigator Washam testified that an evidence technician collected samples for DNA analysis from the portion of the SUV's back seat that the victim identified as where she had been pushed into the SUV. He agreed that the victim's DNA was not identified from the samples collected from the SUV and that no DNA evidence linked the Defendant and the victim or Mr. Keeney and the victim. Investigator Washam acknowledged that he had inaccurately stated when he interviewed the Defendant that incriminating DNA evidence existed and said he had done so in order to obtain truthful information from the Defendant.

The Defendant testified that he had intended to rob the victim. He said he needed money. He acknowledged his prior criminal history for abduction by deceit, arson, solicitation, and perjury. He acknowledged that he had served twenty-two years in Virginia for a sexual offense committed when he was eighteen years old and that the victim was sixteen. He said he was registered as a sex offender. He agreed that he had been out of prison for about seven months when the relevant events occurred.

The Defendant testified that he had been harassed by the police after he was released from prison and that he was nervous they would find a reason to return him to prison. He said police officers searched his house two or three times and claimed they had "received calls about this or that." He said the authorities tried to close his business by telling him that he could not advertise with a sign in front of his house. He said the fire marshal eventually "kicked me out" of the house based upon a zoning issue. He said that he had a car wreck and that he was charged with reckless driving. He said he was concerned because a new criminal charge would violate the terms of his parole. He said he left a voicemail message reporting the new charge to his parole officer and "went on the run" because he had spent over half his life in prison and did not want to return.

The Defendant testified that he reached an agreement with Bobby Keeney whereby the Defendant would purchase a Tahoe SUV that would be titled in Mr. Keeney's name. The Defendant said the plan was that he would use the SUV if he needed to flee and that he would live in the SUV for five or six months or whatever length of time necessary, after which the Defendant would return the SUV to Mr. Keeney. The Defendant said Mr. Keeney would own the SUV "free and clear" after the Defendant finished using it.

The Defendant testified that when he decided to flee Virginia, the SUV was "full of stuff," with about one and one-half feet left below the roof. He said he removed the electronic ankle monitor he was required to wear as a sex offender. The Defendant said he stopped to pick up Mr. Keeney, who put additional items into the SUV. He said they stayed in the Martinsville, Virginia, area until Mr. Keeney learned that the police had been asking questions about them. The Defendant said their original plan had been to go to Colorado to see a man Mr. Keeney called his father, although the man was not Mr. Keeney's biological father. The Defendant said that they went to Colorado and spoke with the man but that Mr. Keeney did not stay with the man. The Defendant said they went to Texas on the way to Colorado in order for Mr. Keeney to visit the mother of his child and his daughter.

The Defendant testified that he and Mr. Keeney stopped in Knoxville to purchase gas. The Defendant said he had not heard from his fiancée since that morning. He said their plan was to reunite and for him to "live under her name" after his five or six months of living as a fugitive. He said he called his ex-wife while he was in Knoxville and that he was scared as a result of the conversation. He said he was, at that point, on his own and had lost his chance for a future. He said he was concerned about his finances because he "had nowhere to go" and did not know what he was going to do. He said that he knew the police were searching for the SUV, that he needed somewhere to go and a new identity, and that he did not have enough money to meet his needs. He said he paid $50 to $60 every time he filled the SUV's gas tank.

The Defendant said he and Mr. Keeney discussed the Defendant's situation and that the Defendant decided to "snatch a purse" to get more money. He said that while they sat in the parking lot where the incident occurred, he saw a woman who parked across the lot away from other cars. He said he drove toward the woman's car and parked with the SUV's passenger side next to the driver's side of her car. He said he turned off the headlights, went to the back passenger door, and pretended to shuffle the SUV's contents in order not to appear suspicious. He said the back of the SUV was still packed full of items.

The Defendant testified that the victim stopped at the front of her car and that he said something like "excuse me." He said he took a step or two back and noticed the

victim's purse between her elbow and her side. He said he waited for her to approach her door and tried to reach for her purse but that it fell to the ground, scattering its contents. He said he looked for a wallet or money but could not see either. He said that the victim started screaming and that "she had slid down against her car into . . . a squat position." He said that he bent over her and tried to put his hand over her mouth to quiet and calm her but that she kept flailing. He said she never stopped screaming except to breathe. He said that the victim kept rocking her head back and forth and that he was in an awkward position. He said he tried to feel her throat for a necklace. He said he thought he was running out of time to take something because she was screaming and other people were in the parking lot. He said that he started to panic, grabbed her arm, pulled her up, and tried to feel for a necklace. He said that the victim "kicked off her car" and that they both fell sideways. He said that he grabbed her arm to try to stop himself from falling but that he fell against the back doorframe of the SUV and that she fell against him. He said that he fell at an angle and that he rolled over her and braced his hands against the SUV to try to get to his feet. He said that he saw the victim reaching for items inside the SUV and that he grabbed her waist and pulled her away from the SUV. He said he "let her go" and had "given up." He said he did not look on the ground for something to steal because he knew he was out of time. He said Mr. Keeney told him that people were coming. The Defendant said the victim stood with a "mean defiant look on her face" after he pulled her away from the SUV and that he walked to the SUV driver's seat and got inside. He denied that the victim ever lost consciousness during the incident and said he never had his hand or arm around her throat. He said he drove away in the wrong direction to leave the parking lot and had to turn around in order to leave.

The Defendant denied that he tried to put the victim in the back of the SUV. He said the back was full and he was driving and would have been unable to control her. He denied hitting or punching the victim and said he had no intention of hurting her. He said Mr. Keeney remained in the passenger seat during the entire incident. The Defendant said that from the time he attempted to grab the victim's purse until he returned to the driver's seat, no more than twenty seconds elapsed.

The Defendant testified that he and Mr. Keeney went through Arkansas on the way to Texas and that they returned to Arkansas to look for his fiancée after they left Texas. The Defendant said that they went through Oklahoma to Colorado to see the man Mr. Keeney called his father but that the man would not allow them to stay with him. The Defendant said they returned to Texas from Colorado. He agreed he was eventually arrested in Las Vegas and gave a statement to Investigator Washam.

The Defendant denied that he intended to kidnap the victim and said he had intended to take her purse and later to take her necklace when he could not get her purse. He said he could have lifted the victim and placed her into the SUV if he had wanted but

that he would not have been able to put her in the SUV due to the items in the back. He said, "I feel bad about what I did."

Regarding his prior criminal history in Virginia, the Defendant testified that he committed arson at age eighteen and received a ten-year sentence. He denied that he had been convicted of "abduction with the intent to sexually molest" and said he was convicted of "abduction by deceit." He also said he later found out "it said something about defile or something." He acknowledged a document reflecting a conviction of abduction with the intent to sexually molest. He denied that he was required to register as a sexual offender as a result of this conviction. The Defendant denied telling an investigator that he had solicited a cellmate to kill the prosecutor in the abduction case but agreed he had said the charge would go away if the prosecutor went away. He acknowledged he had been convicted of solicitation to maliciously wound the prosecutor and a corrections officer. He said he had been charged originally with attempted capital murder, that a judge reduced the charge to conspiracy, and that he was found guilty of solicitation. When shown a document, the Defendant acknowledged he had been found guilty by a Virginia jury of solicitation to aid a prisoner to escape from jail and sentenced to one year, solicitation to commit malicious wounding and sentenced to four years, and solicitation to commit capital murder for hire and sentenced to five years. He agreed that he had been convicted upon his guilty pleas of two counts of perjury related to rape and malicious wounding charges. The Defendant acknowledged an additional solicitation to commit a felony conviction but did not recall the details. Relative to his pending issues in Virginia, he said he faced thirteen years for a parole violation and five years for removing his ankle monitor.

When asked if he had sold stocks and received about $6000 before he removed his ankle bracelet on June 3, 2015, the Defendant did not recall the exact amount he had when he left Virginia on June 5 but said $6000 "sounds about right." He said he had already stopped "several times" for gas by the time he and Mr. Keeney reached Knoxville. The Defendant said he did not want Mr. Keeney to know how much money he had because the Defendant was paying for everything and Mr. Keeney had asked about stopping at restaurants, even though they had food in the SUV, and had selected items for the Defendant to purchase when they were at gas stations. The Defendant agreed he had spent less than $1000 when they arrived in Knoxville. The Defendant said he learned in Knoxville that his fiancée had left him and realized that the money he had would have to last the rest of his life, rather than five or six months. He said he and Mr. Keeney discussed robbing someone but did not discuss a specific plan. He said he made a spur-of-the-moment decision when he saw the victim across the parking lot. He denied that the victim was unable to enter her car because he was in her way. He agreed that he said "excuse me" and stepped back to make her feel comfortable about approaching her car door. When asked about the victim's testimony that he had said, "Shut up, b----. I'll f--- you up," the Defendant was uncertain but thought he had said nothing. He said the

-13-

victim seemed more angry and defiant than scared when she began screaming. He said she could have run away but instead screamed to bring attention to the situation. He acknowledged he could have gotten into the SUV and driven away when he did not see money or a wallet after the victim's purse contents spilled, but he said he panicked. He acknowledged that he did not see a necklace when he grabbed the victim's neck but said he assumed she wore one. The Defendant said that when he fell against the SUV's door frame, the door was open but he and the victim were not inside the SUV. He said that when he regained his balance, he noticed the victim trying to grab things inside the SUV and that he pulled her away from the SUV.

The Defendant testified that he got lost after he drove from the scene and had to stop to ask directions. He said he and Mr. Keeney stopped in Nashville. He said he was not thinking at this point about his financial concerns or about robbing someone. He said that they saw a street event in Nashville and that they went to check it out. He agreed there were a "[l]ot of ladies" but said he was not focused on their purses. He said that he was scared from the incident in Knoxville and that he had never tried to rob anyone before it. He agreed that they met two women in Nashville and that they went to a fast food restaurant but said he did not purchase anything. He said their next stop was at a truck stop after crossing the Mississippi River, that he got into the passenger seat and slept, and that he awoke in Texas the next morning.

The Defendant testified that he was "supposed to be with" a woman named Jade in Texas and that she was a friend of the mother of Mr. Keeney's child. The Defendant said, however, that he learned that Mr. Keeney and Jade were together after the Defendant fled when Mr. Keeney and he were stopped by police. The Defendant said they stayed with the mother of Mr. Keeney's child in Texas. He agreed that when they were stopped by the police in Texas, he gave them his driver's license but drove away and jumped out of the moving SUV when several officers arrived. He said that he ran through brush and woods and that his money was in the motel room. He said he returned to the motel, waited outside, and talked with Mr. Keeney, who was supposed to buy a car for the Defendant for $700. The Defendant said Mr. Keeney was supposed to register the car in Mr. Keeney's child's mother's name but that Mr. Keeney never returned to the motel. The Defendant said he left the motel area when he realized helicopters and police were searching for him. The Defendant said he was able to get a ride to Walmart, that he met a cashier who knew someone who had a car for sale, and that he paid $2000 for it. He acknowledged he had spent $2700 on cars in Texas and said he was concerned about money but did not consider committing more robberies because he had been scared by the incident in Knoxville.

The Defendant testified that he wanted to get "another ID." He said he went to Las Vegas, where he met a homeless woman with whom he rented a motel room. He

-14-

said that she agreed to "put things in her name" and that he did not have to worry about spending thousands of dollars on a false identification.

Kathryn Bigley testified that she lived in Martinsville, Virginia, in 2014 and 2015 and that she met the Defendant through her former employment as a prison librarian. She said the Defendant had been a prison library aide. She said that she had been in business with the Defendant after his release from prison and that they purchased storage lockers and resold the contents online. She said she started the business before the Defendant was released from prison and that after his release, they lived together in an apartment in the business's warehouse. She said that after the Defendant was released and moved into the warehouse, they were "harassed" about the property's zoning not permitting their living on it. She said that after the Defendant was in custody following his flight from Virginia, she spoke with him about "Christina" no longer being in the area. In Ms. Bigley's opinion, the Defendant was "a very truthful man."

Ms. Bigley acknowledged that she and the Defendant had been in a romantic relationship, which was against the prison's rules, that they married, and that she resigned. She acknowledged that she had worked for a school, that she stored a gun in her glove box because she was being harassed by prison employees, that the authorities overheard monitored telephone conversations she had with the incarcerated Defendant about the handgun, that she was arrested and convicted, and that she was later granted clemency. She denied that the authorities overheard the Defendant and her discussing kidnapping a child from a school for the Defendant to rape and kill. She said, "They construed some stories." She said the Defendant was concerned because she was being harassed and that "he tried to push me away by trying to make himself into a monster on the phone." She agreed she was aware of the Defendant's convictions for facilitation of a felony, two counts of perjury, and abduction with the intent to sexually assault. She said that she met the woman who had been the victim of the Defendant's abduction conviction and that the woman stated the woman had been age sixteen and the Defendant had been age eighteen at the time of the offense. Ms. Bigley said the woman was surprised the Defendant was still in prison at the time and had signed an affidavit supporting the Defendant's parole.

The presentment charged the Defendant as follows:

**Count 1:** Aggravated Kidnapping by unlawfully and knowingly removing the victim so as to interfere substantially with her liberty, where the victim suffered bodily injury

**Count 2:** Aggravated Kidnapping by unlawfully and knowingly confining the victim so as to interfere substantially with her liberty, where the victim suffered bodily injury

-15-

**Count 3:** Aggravated Kidnapping by unlawfully and knowingly removing the victim so as to interfere substantially with her liberty, with the intent to terrorize the victim

**Count 4:** Aggravated Kidnapping by unlawfully and knowingly confining the victim so as to interfere substantially with her liberty, with the intent to terrorize the victim

After receiving the proof, the jury acquitted the Defendant of aggravated kidnapping as charged in Count 1 but found him guilty of the lesser included offense of attempted aggravated kidnapping. The jury found the Defendant guilty of the charged offense in Count 2. The jury acquitted the Defendant of aggravated kidnapping as charged in Count 3 but found him guilty of the lesser included offense of attempted aggravated kidnapping. The jury found the Defendant guilty of the charged offense in Count 4. The trial court merged the convictions into a single count of aggravated kidnapping and sentenced the Defendant, a Range II offender, to fifteen years to be served at 100%. This appeal followed.

# I

### Sufficiency of the Evidence

The Defendant contends that the evidence is insufficient to support a conviction of aggravated kidnapping or attempted aggravated kidnapping. The State counters that the evidence is sufficient. We agree with the State.

In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007). The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques*, 221 S.W.3d at 521. The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given the evidence . . . are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005). "The standard of review 'is the same whether

the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

As relevant to this appeal,

Aggravated kidnapping is false imprisonment, as defined in § 39-13-302, committed:

. . .

(3) With the intent to inflict serious bodily injury on or to terrorize the victim or another;

[or]

(4) Where the victim suffers bodily injury[.]

T.C.A. § 39-13-304(a)(3), (4) (2018). "A person commits false imprisonment who knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty. *Id.* § 39-13-302 (2018). "'Bodily injury' includes a cut, abrasion, bruise, burn or disfigurement, and physical pain or temporary illness or impairment of the function of a bodily member, order, or mental faculty[.]" *Id.* § 39-11-106(2) (2018). "As an element of [the] offense of aggravated kidnapping, ["terrorize"] is an act which is done to fill [a victim] with intense fear or to coerce by threat or force." *Terror*, Black's Law Dictionary (6th ed. 1991). As relevant to this case, "A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." T.C.A. § 39-11-106(20). Criminal attempt is defined as follows:

(a) A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense:

(1) Intentionally engages in action or causes a result that would constitute an offense, if the circumstances surrounding the conduct were as the person believes them to be;

(2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or

-17-

(3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

*Id.* § 39-12-101(a)(1)-(3) (2018).

Viewed in the light most favorable to the State, the evidence shows that the Defendant selected the victim after seeing her walk into a store with her wallet in her hand. He drove next to her car and stood outside, rummaging in the backseat of his SUV as she approached her car. When she was near, he choked her from behind, and her belongings scattered on the ground. The Defendant did not attempt to retrieve any of the scattered belongings. The more the victim struggled, the more the Defendant choked her. He repeatedly attempted to silence her by placing his hand on her mouth. He told her, "Shut up, b----. I'll f--- you up," and threatened to snap her neck unless she stopped screaming and got into the SUV. The victim briefly lost consciousness, and when she regained consciousness, she was partially inside the SUV. The Defendant held the victim's head down against the SUV's carpet. The Defendant said something like "grab her" to Mr. Keeney. An eyewitness saw two men trying to push a woman into a vehicle. The incident occurred "within a couple of minutes." Despite struggling and screaming, the victim did not escape until the Defendant fled the scene. She sustained knots on her head, scratches, and bruises on her arms, legs, and ribs. She was traumatized emotionally.

This evidence established that the Defendant confined the victim, that he attempted to remove her, that he interfered substantially with her liberty over the course of a couple of minutes, that she suffered bodily injury, and that he intended to terrorize her. The jury discredited the Defendant's claim that he intended to rob the victim, not kidnap her, as was its province as the trier of fact. The evidence is sufficient to support the elements of the conviction offenses. The Defendant is not entitled to relief on this basis.

## II

### Denial of Motion to Dismiss or for a Preliminary Hearing

The Defendant contends that the trial court erred in denying his motion to dismiss the case based upon the lack of a preliminary hearing and that the court erred, as well, in denying his request in the alternative for a belated preliminary hearing. The State contends that the court properly denied the motions. We agree with the State.

The record reflects that defense counsel learned for the first time at the suppression hearing that, at the time of the Las Vegas interview, the Defendant had been the subject of an outstanding Knox County warrant related to the incident in the present case. The prosecutor stated, however, that the Defendant was never served with this warrant and that his extradition was based upon a June 24, 2015 indictment. After the suppression hearing, the Defendant filed a motion to dismiss the prosecution due to the lack of a preliminary hearing. Alternatively, he sought a belated preliminary hearing in the event the trial court denied the motion to dismiss.

The Defendant relied upon Tennessee Rule of Criminal Procedure 5(e)(1) to support his motion. At the time of the pertinent events, Tennessee Rule of Criminal Procedure 5(e)(1)[3] provided, "Any defendant arrested or served with a criminal summons prior to indictment or presentment for a misdemeanor or a felony, except small offenses, is entitled to a preliminary hearing. A preliminary hearing may be waived as set forth by subsection (2) or as otherwise provided in this rule." At the time, Rule 5(d)(3) provided that, unless waived by the defendant, a preliminary hearing must be conducted within ten days of arrest or service for a defendant in custody or within thirty days for a defendant on release status. At the time, Rule 5(e)(4)[4] provided:

> If an indictment or presentment is returned against a defendant who has not waived his or her right to a preliminary hearing, the circuit or criminal court shall dismiss the indictment or presentment on motion of the defendant filed not more than thirty days from the arraignment on the indictment or presentment. The dismissal shall be without prejudice to a subsequent indictment or presentment and the case shall be remanded to the general sessions court for a preliminary hearing.

The court held a hearing on the motion, at which the parties did not offer proof. Defense counsel stated that the court had received proof relative to the issue at the motion to suppress and that the dismissed warrant had been attached to the motion.

Because the evidence received at the suppression hearing is relevant to both this issue and to section IV pertaining to the trial court's denial of the motion to suppress, we will recount it here.

At the hearing on the motion to suppress, Investigator Washam testified that, as part of the investigation in this case, he interviewed the Defendant in Las Vegas, Nevada.

---

[3] The provisions of former Rule 5(e)(1) are now found in subsection (f)(1).

[4] The provisions of former Rule 5(e)(4) are now found in subsection (f)(4).

Investigator Washam said that before he arrived in Nevada, he sent Las Vegas Police Detective Travis Ivey information to obtain a search warrant for a car and for buccal swabs of the Defendant.

Investigator Washam testified that he and Detective Travis Ivey met with the Defendant at the Clark County, Nevada jail on June 18, 2015. Investigator Washam said that before they met with the Defendant, he told Detective Ivey that he planned to tell the Defendant that the co-defendant, Mr. Keeney, "had already handed [the Defendant] up."

Investigator Washam testified that he advised the Defendant of his *Miranda* rights and that the Defendant signed a waiver of his rights. Investigator Washam identified an audio recording of his interview of the Defendant and a diagram Investigator Washam drew and the Defendant initialed during the interview. The recording and the diagram were received as exhibits.

Investigator Washam testified that Detective Ivey wore a polo-type shirt with the words "Las Vegas Metro Homicide." Investigator Washam thought that both he and Detective Ivey had removed any weapons before entering the jail. Investigator Washam said the Defendant was in custody but did not remember whether the Defendant's legs were shackled. He agreed that the interview took place inside a room in a locked facility.

Investigator Washam testified that the Defendant had an outstanding Knox County, Tennessee warrant at the time of the interview. Investigator Washam said he had testified before the grand jury before he went to Las Vegas. He said the Defendant was being held in Las Vegas based upon Virginia and Knox County, Tennessee warrants listed in the NCIC database. Investigator Washam said he had spoken with a United States Marshal who had advised that the Marshals Service was attempting to locate the Defendant based upon the warrants listed in the database.

Investigator Washam acknowledged that the Defendant said early in the interview that he wanted to be "left in peace," which Investigator Washam explained the Defendant had stated in reference to his issues in Virginia but not in reference to speaking with Investigator Washam. Investigator Washam said it was clear from the context that the Defendant's comment was in reference to the Virginia warrant.

Investigator Washam acknowledged that he told the Defendant the police had a video recording of the Defendant coming out of the plaza where the incident occurred, even though the police did not have a recording. Investigator Washam explained that the police had an electronic file of a recording from a laundromat but that the file did not work. He said that he had not viewed the recording but that his partner, Officer Clay Madison, had. Investigator Washam denied that he falsely told the Defendant that a woman had identified the Defendant as the person who pulled her into a vehicle.

-20-

Investigator Washam agreed that he told the Defendant that making a statement "really does make a difference in the impact" with Investigator Washam, a judge, and jurors. Investigator Washam said he told the Defendant that he had no control over what happened in Virginia but that Investigator Washam would advise a Tennessee prosecutor if the Defendant "owned up to what he did." Investigator Washam agreed that he said he thought the Defendant was making a mistake by being reluctant to talk and that he told the Defendant it made a difference if a person acknowledged that an event had occurred. Investigator Washam agreed that he made a comment about witnesses changing their accounts of alleged offenses and said he made the comment in reference to a rape case. Investigator Washam said the Defendant was concerned about his perception that he had been mistreated by Virginia authorities. Investigator Washam agreed that he told the Defendant that unless the Defendant was "Ted Bundy," the Defendant should explain what had happened in the Tennessee case. Investigator Washam agreed that his intent was to convey that the Tennessee authorities would view a robbery differently than "this guy who's waiting in the bushes to grab a girl and rape her and potentially kill her." Investigator Washam agreed that he told the Defendant his DNA might be on the victim but did not think he said the Defendant's DNA had been found. Investigator Washam thought his partner had collected DNA swabs from the victim. He agreed that he told the Defendant that carpet from inside the car would go to the TBI Laboratory but that nothing had been sent to the laboratory at the time. Investigator Washam agreed that he said DNA evidence was "absolute" in court, even though the authorities had no DNA evidence at the time. He agreed that, in response to the Defendant's question about the possible length of a Tennessee sentence, Investigator Washam explained that it was determined by a formula but that Investigator Washam did not understand it. He agreed that Detective Ivey made comments about the operation of Nevada sentencing laws.

Investigator Washam testified that Detective Ivey told the Defendant, "You're not the victim. The victim is the victim here," and that the Defendant started to cry. Investigator Washam thought Detective Ivey's comment convinced the Defendant to give a statement.

When asked whether he had shown the Defendant a copy of the Knox County warrant, Investigator Washam did not recall doing so. Investigator Washam did not think they had discussed a Knox County warrant during the interview.

Investigator Washam testified that it took him twenty-four to thirty hours after learning the Defendant was in custody to make arrangements to interview the Defendant in Las Vegas. Investigator Washam thought the Defendant had been in custody for less than twenty-four hours when Investigator Washam was notified about the Defendant's arrest.

Investigator Washam testified that the violent crimes unit was not notified of the incident until the following day. He said that some "fairly new patrol officers" had responded to the scene and that he and Investigator Madison had been displeased with how the patrol officers had handled the case on the night of the incident. He noted that the patrol officers had not collected evidence or taken photographs. He said departmental protocol required that photographs be taken of any injuries.

Investigator Washam agreed that the Defendant was unhappy about how he had been treated in Virginia and expressed concern repeatedly about how he would be treated in Tennessee. Investigator Washam noted that the Defendant was concerned about the Tennessee offense "being a sex offender's situation versus robbery" and that the Defendant was concerned Tennessee would view his actions as being sexually motivated. Investigator Washam noted that no additional charges were filed against the Defendant after the Defendant cooperated with the authorities.

Investigator Washam testified that no fingerprints matching those of the Defendant and the victim were found in the SUV. Investigator Washam said that the Defendant claimed the victim ended up partially in the SUV during the struggle.

In its order denying the motion, the trial court made the following pertinent findings: A warrant was issued on June 10, 2015, which charged the Defendant with an incident occurring on June 4, 2015. The Defendant was arrested in Las Vegas on unrelated Nevada charges on June 15, 2015. "It appears that a hold was placed on the defendant from the Knox County charge while he was in custody of the Nevada authorities. However, no proof has been submitted by either side on that issue." The Defendant was interviewed by a KPD investigator while he was in custody in Las Vegas and was transported to the custody of the Knox County Sheriff. On June 24, 2015, the Knox County Grand Jury returned a presentment charging the Defendant with aggravated kidnapping. The original warrant was never served on the Defendant and was cancelled on June 26, 2015. The Defendant was booked on the presentment on July 1, 2015. He was arraigned on July 8, 2015. The Defendant filed the motion to dismiss on March 4, 2016.

The trial court denied the motion for two reasons. First, the court found that the Defendant had not filed his motion within the thirty days required by Rule 5(e)(4). Second, the court found that the Defendant failed to show that Rule 5(e) applied to the facts of the case to create a right to a preliminary hearing. The court found that the Defendant had not shown that he had been served with the warrant when he was arrested for Nevada charges. The court stated that the Defendant had not established that he had a right to a preliminary hearing based upon an interstate hold on a warrant.

The Defendant argues on appeal that, despite his failure to move for dismissal within the thirty-day limit of Rule 5(e)(4), the trial court should have applied the principle of equitable tolling and granted his motion. He argues that he was unaware of the existence of the warrant until he learned of it at the hearing on the motion to suppress, which was held on February 5, 2016.

We begin our analysis by noting that the Defendant has not cited any authority to support the application of the principle of equitable tolling to Rule 5 motions to dismiss filed more than thirty days after the arraignment. It is unnecessary for us to examine that issue, however, because even if we were to conclude that the doctrine of equitable tolling applies to motions to dismiss under Rule 5, the Defendant would not be entitled to its benefits because equitable tolling is not available "to pursue a patently non-meritorious ground for relief." *See Nunley v. State*, 552 S.W.3d 800, 829 (Tenn. 2018) (quoting *Harris v. State*, 301 S.W.3d 141, 153 (Tenn. 2010) (Koch, J., concurring)).

In that regard, the Defendant claims that he is entitled to dismissal of the presentment in case number 105761, which was filed on June 24, 2015, and is the charging instrument in the present case, because he never received a preliminary hearing on warrant 1117689, which was never served on him and was cancelled on the State's motion on June 26, 2015. Rule 5(e)(1) applies to "[a]ny defendant arrested or served with a criminal summons prior to indictment or presentment." Because it is undisputed that the Defendant was never served with the warrant, Rule 5(e)(1) applies only if he was arrested pursuant to the warrant. The recording of the June 18, 2015 Las Vegas interview reflects that Investigator Washam advised the Defendant, "In Tennessee you are being charged with aggravated kidnapping." Investigator Washam testified that the Defendant was held by Nevada authorities based upon outstanding warrants from Tennessee and Virginia that had been entered into a national database. However, when discussing the Defendant's initial encounter with police in Nevada, Detective Ivey stated in the interview that the police had received a report from a woman who alleged that she had been held against her will, which led to the Las Vegas police response to the motel room where the Defendant was staying. The prosecutor stated at the hearing on the motion to dismiss that the Defendant had not been held in Nevada based upon the Tennessee warrant. She explained that a hold was placed on the Defendant based upon the grand jury's return of the presentment and that the first warrant was cancelled. She further explained that the warrant had not been the basis for Tennessee's priority over Virginia in prosecuting the Defendant and that Virginia authorities had agreed to allow Tennessee to prosecute the Defendant first because a conviction in Tennessee would constitute a violation of his release in Virginia.

-23-

The Defendant has offered no evidence to show he was arrested pursuant to or served with the Tennessee warrant. To the contrary, the evidence shows that he was arrested in Nevada for alleged Nevada conduct,[5] that he was not served with the Tennessee warrant, that he was charged by presentment in Tennessee for the incident involving the victim, that the Tennessee warrant was cancelled, and that he was arraigned in Tennessee based upon the presentment that forms the basis for the present case. Because the Defendant was not entitled to a preliminary hearing upon a warrant on which he was never arrested and which was never served upon him, the trial court did not err in denying the motion to dismiss or for a preliminary hearing. The Defendant is not entitled to relief on this basis.

## III

### Denial of Motion to Suppress

The Defendant contends that the trial court erred in denying his motion to suppress the pretrial statement he gave during his Las Vegas detention. He argues that the statement was not voluntarily given because it was induced by false statements by the police officers who interviewed him. The State counters that trial court did not err in denying the motion because the Defendant's statement was knowingly and voluntarily given. We agree with the State.

A trial court's findings of fact on a motion to suppress are conclusive on appeal unless the evidence preponderates against them. *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996); *State v. Jones*, 802 S.W.2d 221, 223 (Tenn. Crim. App. 1990). Questions about the "credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." *Odom*, 928 S.W.2d at 23. The prevailing party is entitled to the "strongest legitimate view of the evidence and all reasonable and legitimate inferences drawn from that evidence." *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998); *see State v. Hicks*, 55 S.W.3d 515, 521 (Tenn. 2001). A trial court's application of the law to its factual findings is a question of law and is reviewed de novo on appeal. *State v. Yeargan*, 958 S.W.2d 626, 629 (Tenn. 1997). In reviewing a trial court's ruling on a motion to suppress, this court may consider the trial evidence as well as the evidence presented at

---

[5] In its brief, the State asserts that the Defendant was arrested in Nevada on Nevada charges and cites to the trial court's order as support for this fact. The appropriate citation to the record for a statement of fact upon which a party relies is to the location in the record of the supporting factual evidence itself, not to the factual findings of a lower court. Although we are bound by a lower court's factual findings unless they are unsupported by the record, a lower court's finding of fact does not constitute evidence of that fact. In this instance, the appropriate citation would have been to the recording that was received as an exhibit at the suppression hearing, with an identification of the location on the recording where the pertinent evidence is found.

the suppression hearing. *See State v. Henning*, 975 S.W.2d 290, 297-99 (Tenn. 1998); *see also State v. Williamson*, 368 S.W.3d 468, 473 (Tenn. 2012).

The Fifth Amendment of the United States Constitution, which applies to the states via the Fourteenth Amendment, provides that "no person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. Similarly, Article I, section 9 of the Tennessee Constitution states that "in all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself." Tenn. Const. Art. I, § 9. "The test of voluntariness for confessions under Article I, § 9 of the Tennessee Constitution is broader and more protective of individual rights than the test of voluntariness under the Fifth Amendment." *State v. Smith*, 933 S.W.2d 450, 455 (Tenn. 1996); *see State v. Northern*, 262 S.W.3d 741, 763 (Tenn. 2008). To be considered voluntary, a statement must not be the product of "any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence." *State v. Smith*, 42 S.W.3d 101, 109 (Tenn. Crim. App. 2000) (quoting *Bram v. United States*, 168 U.S. 532, 542-43 (1897)). A defendant's subjective perception is insufficient to establish the existence of an involuntary confession. *Id*. The essential inquiry is "whether the behavior of the State's law enforcement officials was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined [.]" *State v. Kelly*, 603 S.W.2d 726, 728 (Tenn. 1980) (quoting *Rogers v. Richmond*, 365 U.S. 534, 544 (1961)). A confession is involuntary if it is the product of coercive state action. *See, e.g.*, *Colorado v. Connelly*, 479 U.S. 157, 163-64 (1986).

In determining whether a confession is voluntary, a trial court examines the totality of the circumstances, which encompasses "both the characteristics of the accused and the details of the interrogation." *State v. Climer*, 400 S.W.3d 537, 568 (Tenn. 2013) (quoting *Dickerson v. United States*, 530 U.S. 428, 434 (2000)). Relevant circumstances include the following:

> [T]he age of the accused; his lack of education or his intelligence level; the extent of his previous experience with the police; the repeated and prolonged nature of the questioning; the length of the detention of the accused before he gave the statement in question; the lack of any advice to the accused of his constitutional rights; whether there was an unnecessary delay in bringing him before a magistrate before he gave the confession; whether the accused was injured, intoxicated[,] or drugged, or in ill health when he gave the statement; whether the accused was deprived of food, sleep, or medical attention; whether the accused was physically abused; and whether the suspect was threatened with abuse.

*State v. Huddleston*, 924 S.W.2d 666, 671 (Tenn. 1996) (quoting *People v. Cipriano*, 429 N.W.2d 781, 790 (Mich. 1988)).

-25-

The Defendant argues that his statement was coerced by deceptive police practices. He has identified several representations made by Investigator Washam and Detective Ivey which he claims were false or misleading:

1. The police had a video recording which showed the Defendant and Mr. Keeney at the scene, despite the police not having possession of such a recording;

2. The victim identified the Defendant as the person who perpetrated the attack;

3. The Defendant would appear like rapist and serial killer Ted Bundy unless he confessed;

4. The Defendant's DNA would be on the victim if he had physical contact with her, despite the police not having any DNA evidence;

5. DNA evidence was "absolute" in court, despite the lack of DNA evidence; and

6. Investigator Washam gave the Defendant incorrect information about the possible sentence he faced.

The Defendant also argues that the confession was not voluntary because Detective Ivey became angry and yelled at him during the interview and that Detective Ivey made legally incorrect statements about the effect of prior convictions on the sentence the Defendant might receive.

In denying the motion to suppress, the trial court made the following factual findings:

[O]n June 18, 2015, Detective Michael Washam of the Knoxville Police Department (KPD) traveled to Las Vegas, Nevada where he interviewed the defendant regarding allegations that the defendant was involved in an alleged kidnapping in Knoxville in the recent past. The defendant was in the custody of Las Vegas law enforcement on unrelated charges in Las Vegas. The defendant was taken into custody on those charges three days earlier. Detective Washam was accompanied by an Investigator with the Las Vegas Police Department, Travis Ivy. The first part of the interview focused exclusively on the Knoxville allegations.

-26-

Detective Washam began the interview by explaining to the defendant his *Miranda* rights. He explained to the defendant that if he wanted to talk to the detective, he must sign the waiver. The defendant agreed and signed the written waiver form. He appeared from the conversation to understand his rights and to speak with the investigators freely and voluntarily. At no point during the interview did the defendant make a request for an attorney or declare he wished to stop speaking with the investigators. To the contrary, the defendant revealed several times that he wanted to speak to the investigators so he could find out what they knew and what the witnesses were saying. At one point, the defendant used the phrase, "I just want to be left in peace." However, the context makes it clear that the defendant was not referring to the ongoing interview. He was speaking about his life in general in light of his past criminal justice issues from the State of Virginia. This was not an unequivocal request for counsel or invocation of his right to remain silent. Furthermore, the record reflects that the defendant has a serious criminal history. This was not his first occasion to speak with the police or to have his rights explained to him.

Detective Washam was quite polite and cordial throughout the interview. He told the defendant that he had more evidence of the crime than he actually had in his possession or knowledge. The detective was attempting to get the defendant to make admissions in the guise of getting the defendant's explanation of why he committed the offense instead of asking if he actually was the one who committed it. The defendant never denied being involved in the incident in Knoxville. He expressed early on his concern that it didn't matter what he said about the Knoxville offense because he was going to prison for life in Virginia. He was also very defensive about being considered a sexual predator. The investigators attempted to use this to get the defendant to admit he committed the offense for the purpose of robbery and not sexual assault.

Detective Washam told the defendant that if he cooperated and told them why they tried to force the victim into the van that he would speak to the DA and tell her that the defendant cooperated and was not trying to rape the woman. He indicated to the defendant that it might make a difference to a judge and jury. However, he also made it clear that he could not make him any promises. The defendant continued to maintain that it wouldn't make a difference, whatever he said, that he was "screwed."

At this point, Investigator Ivy took a different approach. He began to be more forceful and confrontational. He told the victim he was acting like the victim. He told the defendant to put himself in the victim's place.

Investigator Ivy raised his voice when speaking with the defendant at this point in the interview. However, this period of confrontation was very brief. The defendant at first maintained that whatever he said would be twisted. He then said that he felt bad. He began to sound sad, remorseful, and teary. He said to tell the victim he was sorry and that he wasn't going to rape her. The defendant then explained that they were blowing through their money quickly and were looking to make a quick score. They were attempting to rob the victim of cash and not rape her. He explained that he was not even trying to kidnap her. She just started yelling and he was trying to shut her up.

After the defendant answered questions and gave an explanation of the incident in Knoxville, Investigator Ivy asked the defendant about what happened in Las Vegas. The defendant answered freely. Before the interview ended, the defendant again expressed his remorse and asked Detective Washam to tell the victim that he was sorry and that she was not going to be raped. This reveals that it was the investigators' appeal to his empathy for the victim that caused the defendant to admit to his involvement in the crime.

Based upon its findings of fact, the trial court concluded that (1) the evidence did not show an unlawful arrest and initial detention which was exploited to obtain the statement, (2) that the Defendant was advised of his *Miranda* rights, and (3) the Defendant was not coerced and made a statement freely and voluntarily. With regard to the issue of coercion, the court made the following pertinent findings:

In this case, the defendant argues that his statement was not voluntary because the detective lied to him about the evidence the police had gathered and misled him about the law in Tennessee. A misrepresentation by law enforcement alone does not invalidate an otherwise voluntary confession. *See State v. Stearns*, 620 S.W.2d 92, 96 (Tenn. Crim. App. 1981); and *Frazier v. Cupp*, 394 U.S. 731, 739, 89 S. Ct. 1420, 1424-25, 33 L.Ed.2d 684 (1969). It is unclear as to what exactly the detective said that was a lie. The detective did make reference to a video which no longer exists. However, the video apparently existed at one point and was viewed by the police. In addition, the co-defendant had given a previous statement. Detective Washam stated that he wanted to give the impression that they already had a lot of evidence that the defendant committed the offense.

The detective also told the defendant that if he cooperated and told them why they accosted the victim that he would speak to the DA. He also

said that a judge and jury may take into account a cooperative statement explaining that they were not going to rape the victim, but just rob her. However, Detective Washam made it clear that he could not make any promises to the defendant. Looking at the statement as a whole, the court finds that the defendant's statement was not obtained as a product of any promises of leniency. These statements by the detective appeared to have little to no effect on the defendant.

To the contrary, the court finds that the defendant gave the incriminating statement when the investigators appealed to his empathy for the victim and desire not to be labeled as a sex offender, not based upon promises of leniency. In doing this, the investigators did not overbear the defendant's will. They used the defendant's own concerns about the public's perception of him as a sex offender and his concern that the victim know she wasn't going to be a rape victim. Although Investigator Ivy raised his voice in challenging the defendant to empathize with the victim, this was a brief incident in the context of a lengthy interview that was otherwise very calm and polite. The defendant was certainly challenged, however, he was not "brow-beaten" into a confession. Investigator Ivy did not overbear the defendant's will. The statement was a product of the defendant's own free will and desire to let the victim know she wasn't going to be a rape victim.

. . .

Looking to the totality of the circumstances, the defendant's statement was knowingly, voluntarily, and freely given. He was explained his rights. He waived those rights. He is a middle aged man with an extensive criminal history. He displayed cunning and awareness in trying to get information out of the investigators while being interviewed by them. He was not coerced into giving the statement by either threats or promises.

Upon review of the record, we conclude that the evidence does not preponderate against the trial court's finding of fact. *See Odom*, 928 S.W.2d at 23; *Jones*, 802 S.W.2d at 223. In our review of the court's ruling on the motion, we have considered the trial court's factual findings from the suppression hearing and the trial evidence. *See Henning*, 975 S.W.2d at 297-99; s*ee also Williamson*, 368 S.W.3d at 473. In our review of the totality of the circumstances, we have considered the alleged false or misleading statements the Defendant attributes to the officers who interviewed the Defendant.

We conclude that the trial court did not err in denying the motion to suppress. Although the officers were less than entirely truthful with the Defendant and encouraged

the Defendant to confess in order not to appear to be a sexual predator, with one of the investigators briefly raising his voice at the Defendant, the evidence supports the trial court's conclusion that the Defendant was not coerced and gave his statement freely and voluntarily. *See Stearns*, 620 S.W.2d at 96; *see also Frazier*, 394 U.S. at 739; *State v. Ronallen Hardy*, No. M2008-00381-CCA-R3-CD, 2009 WL 2733821, at *9 (Tenn. Crim. App. Aug. 31, 2009) (holding that, in view of the totality of the circumstances, the police did not coerce the defendant's confession by falsely telling him that they could determine the date his fingerprints were left in a vehicle); *State v. Stanley Earl Cates*, No. E2003-02648-CCA-R3-CD, 2004 WL 2951976, at *5 (Tenn. Crim. App. Dec. 20, 2004) (holding that police deception during an investigation did not amount to a constitutional violation); *State v. Monoleto Delshone Green*, No. 01C01-9510-CC-00351, 1996 WL 741551, at *4 (Tenn. Crim. App. Dec. 30, 1996) (holding that a detective's misrepresentation of evidence was relevant when reviewing the totality of the circumstances but that it did not invalidate the confession as a matter of course). As the court noted, the Defendant was experienced in the criminal justice system and was concerned about not being perceived as a sexual predator, which compelled him to explain that his attack on the victim had been an attempt to rob her, not an attempt to sexually assault her. When viewed in conjunction with the totality of the evidence, the officers' conduct during the interview was not of a nature to overbear the free will of a suspect in the Defendant's situation.

The trial court did not err in denying the motion to suppress. The Defendant is not entitled to relief on this basis.

## IV

## Jury Instructions

The Defendant contends that the trial court erred in denying his request for a jury instruction pursuant to *State v. White*, 362 S.W.3d 559, 578 (Tenn. 2012), which holds that a defendant charged with a kidnapping and an accompanying felony is entitled to a jury instruction that the jury is to determine whether the defendant's removal or confinement of the victim was essentially incidental to committing an accompanying felony offense. The State responds that the *White* instruction is not required when the State elects to charge a defendant with a kidnapping offense but not with another felony offense. We agree with the State.

In *White*, our supreme court delineated a new method for determining whether dual convictions for a kidnapping-related offense and another felony offense are permissible pursuant to due process principles. The court determined that a separate due process inquiry was unnecessary and concluded that a proper jury instruction in conjunction with appellate review of sufficiency of the evidence satisfied due process

-30-

principles. *Id*. at 577-78; *see State v. Cecil*, 409 S.W.3d 599, 609 (Tenn. 2013) ("Only when the jury is properly instructed can appellate review of the sufficiency of the convicting evidence satisfy the due process safeguard."). The *White* instruction requires a trial court to provide a jury instruction "defin[ing] the key element [of the kidnapping-related offense] – the substantial interference with the victim's liberty – as requiring a finding by the jury that the victim's removal or confinement was not essentially incidental to the accompanying felony offense." *White*, 362 S.W.3d at 580.

Subsequent cases applying the *White* instruction have involved a kidnapping-related offense in conjunction with another felony offense, most notably robbery, assault, and rape. *See State v. Rico R. Williams*, No. W2011-02365-CCA-RM-CD, 2014 WL 60967 (Tenn. Crim. App. Jan. 7, 2014) (analyzing the *White* instruction relative to charges for especially aggravated kidnapping and aggravated robbery); *State v. Glenn Lydell McCray*, No. M2011-02411-CCA-R3-CD, 2013 WL 6408753 (Tenn. Crim. App. Dec. 6, 2013) (analyzing the *White* instruction relative to charges for especially aggravated kidnapping and aggravated assault); *State v. Jonathan Kyle Husle*, No. E2011-01292-CCA-R3-CD, 2013 WL 1136528 (Tenn. Crim. App. Mar. 19, 2013) (analyzing the *White* instruction relative to charges for especially aggravated kidnapping and aggravated rape). Therefore, the purpose of the *White* instruction is to ensure the confinement or removal associated with a kidnapping-related charge is not merely incidental to accomplishing another felony, such as robbery, assault, and rape. *See State v. Alston*, 465 S.W.3d 555, 562 (Tenn. 2015) ("We have also identified certain crimes – such as robbery, rape, and assault – that, when charged along with kidnapping, would warrant [the *White*] instruction.").

The requirement of a *White* instruction is not absolute, however. In *Alston*, the supreme court said that the instruction was unnecessary in the case of a defendant charged with a kidnapping offense and aggravated burglary. *Id.* The supreme court has also said that the *White* instruction is unnecessary when a defendant is charged with kidnapping of one victim and robbery of another. *See State v. Teats*, 468 S.W.3d 495, 503 (Tenn. 2015); *State v. Williams*, 468 S.W.3d 510, 516-17 (Tenn. 2015).

In the present case, the Defendant is charged with four counts of aggravated kidnapping but not with an accompanying felony. The Defendant nevertheless contends that he was entitled to the *White* instruction based upon the evidence he attempted to rob the victim. Our research reflects that Tennessee appellate courts have not yet addressed this precise factual scenario.

The Defendant relies upon *State v. Salamon*, 949 A.2d 1092, 1122, n.35 (Conn. 2008). In *Salamon*, the defendant was convicted of second-degree kidnapping, first-degree unlawful restraint, and risk of injury to a child related to his having accosted a minor in a train station. *Salamon,* 949 A.2d at 1100-01. The defendant was charged

initially with assault, but the State later filed an amended information that did not include an assault charge. *Id.* at 1102. He requested but was denied a jury instruction that he must be found not guilty of the kidnapping charge if the jury determined "that the defendant's restraint of the victim in connection with the kidnapping was incidental to the defendant's restraint of the victim in connection with his assault of the victim." *Id.* At the time of the *Salamon* defendant's trial, the requested instruction was contrary to controlling precedent, and the trial court's instructions were in accord with existing law. *Id.* at 1101-02. The Connecticut Supreme Court overruled existing precedent and adopted a rule that prohibited convictions of kidnapping and another crime if the confinement or movement was merely incidental to the commission of the other crime. *Id.* at 1101. The court granted the defendant a new trial on the kidnapping charge and stated that "the jury must be instructed that, if it finds that the defendant's restraint of the victim was merely incidental to the defendant's commission of another crime against the victim, that is, assault, then it must find the defendant not guilty of the crime of kidnapping." *Id.* at 1122. The court said that the instruction was necessary, whether or not the state charged the defendant with assault, because the facts would reasonably support an assault conviction. *Id.* at 1122, n.35.

The Tennessee Supreme Court relied on *Salamon* in adopting the rule in Tennessee requiring that a jury be instructed to determine whether the removal or confinement associated with a kidnapping charge was essentially incidental to the commission of another felony. *See White*, 362 S.W.3d at 577. In *White*, the defendant was charged with especially aggravated kidnapping, burglary, and aggravated robbery. *Id.* at 562. Thus, the question of whether the *White* instruction is required in Tennessee when a defendant is charged only with a kidnapping offense was not before the *White* court.

As we have stated, Tennessee appellate courts have yet to address this question. *Cf. State v. Jamie Lynn Moore*, No. M2017-01877-CCA-R3-CD, 2018 WL 6172096 (Tenn. Crim. App. Nov. 26, 2018) (rejecting the defendant's argument, in the context of reviewing the sufficiency of the evidence of an aggravated kidnapping conviction, that *White* was determinative of the outcome even though a companion domestic assault charge had been dropped before the case was submitted to the jury).

*White* addressed "the application of due process principles to *dual convictions* for kidnapping and an accompanying felony, such as rape or robbery." *White*, 362 S.W.3d at 561 (emphasis added). In *Teats*, dual convictions as to the same victim were not present, and the supreme court said that the *White* instruction was not required. *See Teats*, 468 S.W.3d at 503. The *Teats* court reasoned:

> Where a defendant is charged with kidnapping and an accompanying
> offense involving some confinement of the same victim, there are

appropriate due process concerns that the defendant could be convicted of two crimes—e.g. robbery and kidnapping—when he has only committed one crime—robbery. But where, as in this case, the State charged the Defendant with robbing the restaurant manager and kidnapping the four other employees, the Defendant does not stand the risk of being convicted of kidnapping a victim he confined only long enough to rob. Simply put, the due process concerns articulated in *White* are not present, as the kidnapping of one or more victims can never be "essentially incidental" to an offense perpetrated against a different victim or victims. *See White*, 362 S.W.3d at 580.

*Id.*

In the present case, the Defendant was never at risk for being convicted of two crimes, one of which was essentially incidental to the other, because the jury was asked to determine his guilt of only of alternative theories of a single offense, aggravated kidnapping. The jury was charged with the law regarding the elements of aggravated kidnapping and with the law regarding State's burden of proof. After the jury found the Defendant guilty, the trial court had the obligation as thirteenth juror to approve the verdict, and in Section I above, we have reviewed the sufficiency of the evidence to support the conviction. This procedure ensures that the Defendant has been afforded his right to due process.

We acknowledge that the supreme court in *White* relied on *Salamon* in adopting the requirement that the jury determine, upon proper instruction, whether the evidence relied upon to establish a kidnapping shows that the conduct was essentially incidental to the defendant's commission of a charged accompanying felony. However, the court's reliance on *Salamon* pertained to its legal principles, not to its facts, which differed from those before the *White* court. The injustice that may result to a defendant charged with dual offenses is conviction of both of the kidnapping and the accompanying felony, and that concern is absent in this case because the jury was asked to consider, and the Defendant was convicted of, only aggravated kidnapping. We conclude, therefore, that the trial court did not err in denying the Defendant's request for the *White* instruction. The Defendant is not entitled to relief on this basis.

In consideration of the foregoing and the record as a whole, the judgment of the trial court is affirmed.

_____
ROBERT H. MONTGOMERY, JR., JUDGE